## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| LATASHA BROWN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:14-CV-657-RLW |
| | ) |
| CAROLYN COLVIN, | ) |
| ACTING COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## **MEMORANDUM AND ORDER**

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of Social Security's final decision denying Latasha Brown's ("Brown") application for disability insurance benefits under Title II and Title XVI of the Social Security Act.

### **I.     Background**

The Social Security Administration ("SSA") denied Brown's application for benefits (Tr. 111-22) and she filed a timely request for a hearing before an Administrative Law Judge ("ALJ"). The SSA granted Brown's request and a hearing was held on October 1, 2012. The ALJ issued a written decision on January 17, 2013, upholding the denial of benefits. (Tr. 10-21.) Brown filed a timely Request for Review of Hearing Decision with the (Tr. 6). The Appeals Council denied Brown's Request for Review. (Tr. 1-3). The decision of the ALJ thus stands as the final decision of the Commissioner. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000). Brown filed this appeal on March 28, 2014. (ECF No. 1). Brown filed a Brief in Support of her

Complaint. (ECF No. 18). The Commissioner filed a Brief in Support of the Answer. (ECF No. 25). Brown has not filed a reply brief but the time for filing such a brief has run. (ECF No. 5).

## II. Decision of the ALJ

The ALJ found that Brown had a recurrent major depressive disorder and bipolar disorder controlled by medication, possible asthma, and a history of polysubstance dependence, but no impairment or combination of listed in or medically equal to one contained in Appendix 1, Subpart P, Regulations No. 4. (Tr. 18-19). The ALJ determined that Brown's allegations of impairments, either singly or in combination, producing symptoms and limitations of sufficient severity to prevent the performance of any sustained work activity was not credible. (Tr. 19). The ALJ found that Brown had the residual functional capacity (RFC) to perform physical exertional and nonexertional requirements of work except probably for lifting or carrying more than 10 pounds frequently or more than 20 pounds occasionally; having concentrated or excessive exposure to dust fumes, chemicals, temperature extremes, high humidity or dampness, and other typical allergens, pollutants, and atmospheric irritants; doing more than simple, routine, repetitive, unskilled tasks; or having more than occasional interaction with co-workers, supervisors, or the general public. (Tr. 19). The ALJ found that Brown had no past relevant work. (Tr. 19). The ALJ acknowledged that although Brown's limitations do not allow the performance of the full range of light work, there exist a significant number of jobs in the local and national economies which the claimant could perform, including as a housekeeper and handpackager. (Tr. 19). Consequently, the ALJ found that Brown was not disabled. (Tr. 19).

## III. Administrative Record

The following is a summary of relevant evidence before the ALJ.

### A. Hearing Testimony

2

### 1. Brown's Testimony

Dr. David Biscardi, a licensed psychologist, testified on October 1, 2012, as follows:

Dr. Biscardi reviewed Brown's medical file but never personally examined Brown. (Tr. 30). Dr. Biscardi opined that Brown suffers from either major depressive disorder recurrent or bipolar affective disorder, depressed. (Tr. 31). Dr. Biscardi also indicated that Brown has a history of cocaine abuse and history of heroin use. (Tr. 31). Dr. Biscardi stated that he does not believe that any of these impairments meet or equal the criteria of a listed impairment. (Tr. 31-32). Dr. Biscardi admitted that there was evidence in the record of self-harm and that Brown was abused as a child. (Tr. 32). Dr. Biscardi did not believe that Brown attempted suicide and noted that in 2008 Brown was diagnosed as malingering. (Tr. 32). Dr. Biscardi indicated that Brown's mental state did not have much effect on her functioning. (Tr. 32). Dr. Biscardi discounted Brown's self-reported statement in the medical records that she attempted to harm herself at least five times, had mood swings, and had a global assessment functioning (GAF) of 25. (Tr. 32-33). Dr. Biscardi noted that Brown also received a GAF of 45 by the same treatment source. (Tr. 33).

Brown testified on October 1, 2012, as follows:

Brown lives with her sister in her sister's second floor apartment. (Tr. 34-35). There are approximately 12-14 steps to get to the apartment. (Tr. 36). Brown is 5'4" and weighs 155 pounds. (Tr. 35). Brown is single and has eight children—the oldest is nineteen and the youngest is 3 months. (Tr. 35). Brown only lives with the baby. (Tr. 35). She took the bus to today's hearing. (Tr. 36). She receives food stamps but is not on any aid for rent or utilities. (Tr. 36). She has been on Medicaid—Missouri Health Net—since 2004. (Tr. 36). She collected unemployment benefits in 1999. (Tr. 36). The farthest she got in school was the tenth grade.

3

(Tr. 36). She left school because she had a baby and due to problems between her mom and the baby's father. (Tr. 36-37). She was too scared to take the GED. (Tr. 37). She has not received any vocational training. (Tr. 37). She does not have a driver's license. (Tr. 37). She can read and write. (Tr. 37). She last worked for four months in 2008 at Proctor and Gamble in warehousing. (Tr. 37-38). The most she lifted there was 20 pounds. Prior to that, she worked for six months as a cashier and food trainer at McDonald's. (Tr. 38). The most she lifted there was 10 pounds. She stopped working because she started hearing voices and was going back and forth to the hospital due to suicide attempts. (Tr. 38). She heard male and female voices telling her to harm herself. (Tr. 39). She has been hearing the voices for years and prior to her working at McDonald's. (Tr. 39). She tried to harm herself by taking pills prescribed to her as a muscle relaxant. (Tr. 39-40). Since 2008, she has tried to work. She worked at Sims Service at a warehouse for a couple of weeks. (Tr. 40). She stopped working because she heard voices and because she was pregnant. (Tr. 40). She applied for a job at Kohl's a year ago, but she didn't get the job. (Tr. 40-41). She has experience as a warehouse worker in 2007 and 2008, as a cleaning person in 2006 and 2007, as a prep cook in 2006, as a cashier in 2005 and 2006, , and as a babysitter. (Tr. 41-42). Her alleged onset of disability occurred on December 31, 2006, when she was going to slit her wrists but instead the voices told her to set her child's father on fire. (Tr. 42).

Brown wakes up around 6:00 or 6:30 a.m. (Tr. 43). Mondays and Fridays she goes to drug and alcohol treatment. (Tr. 43). Tuesdays she goes to Thrive where she prays and has Bible study classes. (Tr. 43). At her apartment, she cleans, watches TV, cooks, does laundry, washes dishes, vacuums, mops and sweeps. (Tr. 43-44). Her sister makes the bed, changes the sheets, and does the grocery shopping. Brown does not go grocery shopping because she gets

4

nervous and hears things when she is in a crowd. (Tr. 44). She has three friends, but hasn't talked to them in over a year. (Tr. 44). She gets along with her sister. (Tr. 44). She does not see her other children, who are either in custody or have been adopted. (Tr. 44-45). Her nineteen year old stays with his paternal grandmother. (Tr. 45-46). She doesn't talk to her neighbors. (Tr. 45). She has been in narcotics anonymous since March. (Tr. 45). She watches a lot of TV, she reads but has trouble with her concentration. (Tr. 45). She doesn't go out in the evening or on weekends. (Tr. 45-46). Her father is dead and she doesn't get along with her mom. (Tr. 46). She has no hobbies. (Tr. 46). She doesn't have problems taking a shower or bath. (Tr. 46). She doesn't smoke or drink. (Tr. 46). She hasn't used drugs for five months. (Tr. 46). She had been taking half a gram to a gram of heroin a day, which she got from her children's father. (Tr. 47). She is on Risperdal for sleep and to stop the voices, Wellbutrin to control her mood swings, ProAir and Symbicort for her asthma, and Acyclovir for genital herpes. (Tr. 47-48). Perfume and ammonia and bleach can affect her asthma. (Tr. 49).

Brown states that she is bipolar. (Tr. 49). She experiences mood swings, crying spells. (Tr. 49). The Risperdal calms her down. (Tr. 49-50). She was in a mental hospital for one day when she tried to commit suicide by taking a bunch of pills. (Tr. 50). She has tried to harm herself several times. (Tr. 50). The last time was when she was pregnant with her baby. (Tr. 50). She has been seeking psychological care at Hope Well since 2004. (Tr. 51). She has difficulty with her concentration. (Tr. 51). For example, it would take her a day to read a 200 page book. (Tr. 51). She has no problems sitting, standing or walking. (Tr. 51-52). She can lift about 20 to 30 pounds. (Tr. 52). She does not have problems bending, stooping, crouching, kneeling, and crawling. (Tr. 52). She can climb steps. (Tr. 52). She did not attend the

5

consultative examination requested by the Social Security Administration because she didn't know anything about it. (Tr. 52).

Prior to living with her sister, Brown was in treatment at Queen of Peace from the end of February until last week. (Tr. 52). She went to treatment as a requirement of her probation. (Tr. 53). She had a relapse in May but has been clean otherwise. (Tr. 53). She provides urine samples to her probation officer, and all of her samples have been clean. (Tr. 53). She ended up living at her sister's house after there was some "foul up" in her transitional housing after her treatment at Queen of Peace. For a while, she was at the "pregnant house" at St. Philippine, where they helped her with housing, job leads, and schooling. (Tr. 54).

Brown was molested as a young girl by her uncle and her aunt's husband. (Tr. 54). This abuse was not reported to the police. (Tr. 55). Her aunt did not believe her. (Tr. 55). This abuse affects her because she always feels like people are trying to hurt her. (Tr. 55). She feels like she failed her children as a mother and it makes her want to commit suicide. (Tr. 55). She last tried to harm herself when she was pregnant with her youngest child. (Tr. 55). She has mood swings every day associated with being bipolar. (Tr. 55). She can only take her medicine once a day so she often holes herself in her room when she has the mood swings. (Tr. 56). She only hears voices about once a week now that she is on medication. (Tr. 56).

Brown is currently on probation. (Tr. 56). She pleaded guilty in August 2011 to forgery. (Tr. 57). She has only been convicted once. (Tr. 57).

Dr. Darryl Taylor, vocational expert, testified on October 1, 2012 as follows:

Dr. Taylor did not discuss the merits of this case with Brown or her attorney. (Tr. 57). The ALJ asked Dr. Taylor to assume a hypothetical person who is 35 with a limited education and past relevant work as a cleaner, fast-food worker, and a warehouse worker, capable of

6

performing light work (can lift, carry, push, pull 20 pounds occasionally and 10 pounds frequently); can sit, stand, walk sit out of eight for a total of eight out of eight; no concentrated exposure to chemicals, dust, fumes and gases; limited to simple, repetitive tasks and instructions and only occasional interaction with supervisors, coworkers ,and the public. (Tr. 58-59). Dr. Taylor discerned that this hypothetical person could perform her past work as a warehouse worker and also work in unskilled housekeeping positions, light unskilled hand packer positions, as well as other positions. (Tr. 59).

## B. Medical Records

Brown's relevant medical records are summarized as follows:

On March 30, 2008, Brown was seen at Barnes-Jewish Hospital ("BJH"). (Tr. 297-305). Brown reported having suicidal ideation, means to carry out suicide plan, and homicidal ideation. Brown, however, provided a different medical history to the resident, nurse, psychiatrist and the emergency room physician. Brown later reported feeling much better and said that she could return home safely without hurting herself or others.

On June 16, 2008, Brown went to BJH with complaints of chest pain. (Tr. 281). Brown was diagnosed with costochondritis. (Tr. 288).[1]

On January 15, 2010, Brown was diagnosed with a narcotic addiction and a history of heroin addiction during her obstetric appointment. (Tr. 459). On January 16, 2010, Brown gave birth to a baby, and Brown tested positive for opiates upon admission. (Tr. 463). Brown claimed that she had a history of suicide attempts since the placement of her children outside of her care. (Tr. 463).

---

[1] Costochondritis is an inflammation of the cartilage that connects a rib to the breastbone (sternum). http://www.mayoclinic.org/diseases-conditions/costochondritis/basics/definition/con-20024454.

7

On May 21, 2010, Brown had an appointment with Hopewell. (Tr. 487). Brown reported that she was suicidal "every now and then" because he had seven kids but five of them are adopted and two are in DFS's custody. (*Id.*) Brown saw a psychiatrist in 2004 when custody of her first child was taken away by DFS. (*Id.*) She was also referred to Hopewell in 2004. (*Id.*) Brown reported being sexually abused by her uncle (mother's boyfriend) and her aunt's husband. (Tr. 488). She was placed in a group home at the age of thirteen and fifteen. (Tr. 488). Brown reported using marijuana from when she was sixteen until she was nineteen; using cocaine on and off for eight years, beginning when she was 24; and using heroin on the day of her appointment. (Tr. 489). Leepi Khatiwada, MSW, QMHP, determined that Brown had a GAF of 50 with major depression and cocaine dependence. (Tr. 491).

On September 7, 2010, Brown had a psychiatric evaluation at Hopewell. (Tr. 482-85). Brown was diagnosed with narcotic abuse and history of cocaine abuse. (Tr. 484). She was assigned a GAF of 49. (Tr. 484). She was prescribed Risperdal and Celexa. (Tr. 485).

On November 2, 2010, Brown reported to her case manager at Hopewell that had not used drugs in 2 days, but she was hearing her adopted children's voices. (Tr. 525). Brown's Celexa and Risperdal were increased. Brown indicated she was frustrated because she was not able to get a job. (Tr. 520).

On February 22, 2011, Brown was seen at Hopewell Center where she was in a sad mood but presented normal content of thought and presented no signs or symptoms of delusions, illusions, hallucinations or paranoia. (Tr. 517). On that same day, Brown was seen by the doctor; Brown reported crying spells and doing "not so good" but also admitted that she was only partially compliant with her medication. (Tr. 519). Brown reported suicidal ideation but no plans or intent. (Tr. 519).

8

On March 31, 2011, Brown was evaluated by Kyle DeVore, Ph.D., the state reviewing physician. (Tr. 501-11). Dr. DeVore was not able to complete a full review because Brown failed to appear for her examination. Based upon his review of the file, he found that she suffered from affective disorders, and indicated she had a history of malingering, drug use, and depression.

On April 19, 2011, Brown met with the doctor at Hopewell. (Tr. 515). Brown reported an increase in her auditory hallucinations, depression, and crying spells. The doctor increased her Depakote to 1500 mg. Brown reported that her sleep was "better—but still broken throughout the night." (Tr. 516).

On May 31, 2011, Brown reported that she was still tossing and turning in her sleep, her mood was up and down, and she was crying in her sleep. (Tr. 514). She was diagnosed with bipolar disorder II, depression, and a history of opiate and cocaine abuse. (Tr. 514). The doctor prescribed Depakote, Celexa, and Risperdal.

Brown came to Queen of Peace on January 30, 2012 to receive treatment to avoid drug (primarily heroin) use. (Tr. 560-88).

On March 29, 2012, Brown returned to Hopewell Center. (Tr. 529). Brown reported mood swings, crying spells, and trouble sleeping when she thought about her six children in the custody of the Division of Family Services. (Tr. 529). Brown reported that she was on and off her medications from 2004 until 2011 but it had been a year since she had been on any medications. (Tr. 529). Brown indicated that she did not have any problems that would hinder her from "working or going to school." (Tr. 530). Brown was described as well-groomed and pleasant. (Tr. 531). Brown had been in treatment for 30 days. (Tr. 531). Brown indicated that she heard voices but she does not listen to their instructions to harm herself because she is

9

pregnant. (Tr. 531-32). Brown stated that she sees things no one else can see when she is high. (Tr. 532). Brown believed she had a special status with God. (Tr. 532). James A. Owens, MSW, ICCDP diagnosed her with bipolar affective disorder and a GAF of 45. (Tr. 533).

On April 13, 2012, Brown was seen at Hopewell Center. (Tr. 522). Brown reported hearing voices every other night that told her to kill herself. Brown was diagnosed with bipolar affective disorder with a GAF of 45. (Tr. 523).

On June 15, 2012, Brown was seen at Hopewell and she asked for her Risperdal dose to be decreased because the baby wasn't active. (Tr. 512). The doctor decreased the Risperdal dose and stated that Brown's psychotic episodes were well controlled on Risperdal. (Tr. 512).

She began steady treatment at Queen of Peace on August 10, 2012. (Tr. 559). On August 17, 2012, she initially refused to submit a urine analysis after being late for curfew for St. Philippine Home, a housing program through Queen of Peace for pregnant women, and refused to put her newborn son in a car seat for safety reasons. (Tr. 552). On September 20, 2012, Brown was asked to leave the program at St. Philippine Home because she made threatening remarks regarding staff after she was talked to about taking care of her child, not missing doctor appointments, and letting her psychiatric medications run out. (Tr. 611-12).

On November 27, 2012, Brown was seen by Dr. Lo at the Hopewell Center, complaining of worsening mood and stating that she had no medication for more than one week. (Tr. 633). Dr. Lo assigned Brown a GAF of 37 or 35. (Tr. 633). On December 11, 2012, Brown was seen by Dr. Lo; Brown stated that her mood had improved and she was able to read for hours as usual. (Tr. 631-32). Brown denied auditory and visual hallucination. (Tr. 631-32).

On January 22, 2013, Dr. Lo responded to a request from Brown's counsel regarding her low GAF scores. (Tr. 636). Dr. Lo stated that Brown has a current GAF of 50 and has persistent

auditory hallucinations, although they have reduced with her medication. (*Id.*) Dr. Lo stated that Brown "has not been able to hold employment for some time, and [is] unable to mainteine [sic] stable housing." (*Id.*)

## IV.    Legal Standard

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities … ." *Id.* "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. *Id.*

11

Fourth, the impairment must prevent claimant from doing past relevant work.[2] 20 C.F.R. §§ 416.920(e), 404.1520(e). At this step, the burden rests with the claimant to establish his RFC. *Steed v. Astrue*, 524 F.3d 872, 874 n.3 (8th Cir. 2008); *see also Eichelberger*, 390 F.3d at 590-91; *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b)-(e). The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f). If it is found that the claimant can still perform past relevant work, the claimant will not be found to be disabled. *Id.*; 20 C.F.R. § 416.920(a)(4)(iv). If the claimant cannot perform past relevant work, the analysis proceeds to Step 5.

At the fifth and last step, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work. 20 C.F.R. § 416.920(a)(4)(v). If it is found that the claimant cannot make an adjustment to other work, the claimant will be found to be disabled. *Id.*; *see also* 20 C.F.R. § 416.920(g). At this step, the Commissioner bears the burden to "prove, first that the claimant retains the RFC to perform other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to perform." *Goff*, 421 F.3d at 790; *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). The Commissioner must prove this by substantial evidence. *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983).

If the claimant satisfies all of the criteria of the five-step sequential evaluation process, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove

---

[2] "Past relevant work is work that [the claimant] has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it." *Mueller v. Astrue*, 561 F.3d 837, 841 (8th Cir. 2009) (citing 20 C.F.R. § 404.1560(b)(1)).

disability, however, remains with the claimant." *Id.*; *see also Harris v. Barnhart*, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)).

This court reviews the decision of the ALJ to determine whether the decision is supported by "substantial evidence" in the record as a whole. *See Smith v. Shalala*, 31 F.3d 715, 717 (8th Cir. 1994). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Therefore, even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the ALJ's decision must be affirmed if it is supported by substantial evidence. *Clark v. Heckler*, 733 F.2d 65, 68 (8th Cir. 1984). In *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

As such, "[the reviewing court] may not reverse merely because substantial evidence exists for the opposite decision." *Lacroix v. Barnhart*, 465 F.3d 881, 885 (8th Cir. 2006) (quoting *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996)). Similarly, the ALJ decision may not be reversed because the reviewing court would have decided the case differently. *Krogmeier*, 294 F.3d at 1022.

## V. Discussion[3]

Brown claims that the ALJ failed to properly assess her credibility. (ECF No. 18 at 6-8). The ALJ summarized the medical records and found that "the claimant's allegations of

---

[3] The Administration notes that Brown does not challenge the ALJ's evaluation of her alleged physical problems, including asthma and labial herpes (ECF No. 25 at 2 (citing Tr. 11, 15-16)) and, therefore, the Court limits their discussion to Brown's mental impairments.

impairments producing symptoms and limitations of sufficient severity to prevent the performance of all sustained worked activity was not credible." (Tr. 17). Brown argues that the ALJ failed to identify any inconsistencies in the record or any reason for disregarding Brown's testimony or the medical records that support Brown's testimony. (ECF No. 18 at 6-7). Brown claims that she stopped working because she was hearing voices and seeking medical treatment because of her suicidal thoughts. (ECF No. 18 at 7 (citing Tr. 38-39)). Brown notes that she also had crying spells, mood swings, and feelings of worthlessness. (ECF No. 18 at 7 (citing Tr. 48, 482-83)). Brown also maintains that although she did not have a "steady course of treatment," she had GAF scores ranging from 25-50 "with medications," which indicates that she had "serious symptoms or impairment in functioning to behavior that is considerably influenced by delusions, hallucinations, or serious impairment an inability to function in almost all areas." (ECF No. 18 at 7).

Brown also claims that the RFC is not supported by substantial evidence. (ECF No. 18 at 8-10). Brown argues that the ALJ incorrectly based his RFC only on the Medical Expert's (Dr. Biscardi) testimony and ignored all of the evidence from her treating sources. (ECF No. 18 at 9-10). Brown stated that the ALJ "ignored the evidence provided by Brown's treating physician and failed to discuss how that evidence was considered and why it was not given any weight and how it was consistent with [Dr. Biscardi's] testimony." (ECF No. 18 at 9). Brown complained that the ALJ "failed to explain how moderate limitations in concentration, persistence and pace, and social functioning translate into the limitations that he found in the RFC." (ECF No. 18 at 10). Likewise, Brown states that the ALJ failed to discuss Brown's "low GAF scores and why those were not considered and taken into account in the decision and how they affect Plaintiff's ability to function." (ECF No. 18 at 10). In sum, Brown contends that Dr. Biscardi's "testimony

14

was conclusory and the entire decision rests upon the one conclusory statement from [Dr. Biscardi", who never examined Brown. (ECF No. 18 at 10).

The Court finds that the ALJ properly evaluated Brown's credibility and the ALJ's RFC determination was supported by substantial evidence. The Court finds that ALJ evaluated the medical evidence, Brown's activities of daily living and the supporting medical documents to evaluate Brown's credibility and determine her RFC.

The Court holds that the ALJ appropriately evaluated Brown's credibility as part of determining the RFC. "Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility." *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001). For example, the Court notes that Brown indicated that she wanted to go to school and get a job. (Tr. 520, 530). The Court finds that Brown's "job search undermines" her claim that she "was unable to work." *Melton v. Apfel*, 181 F.3d 939, 942 (8th Cir. 1999).

Likewise, Brown's activities of daily living, including personal care, care for her infant son, preparing meals, and performing household chores such as doing laundry, washing dishes, vacuuming, mopping, and sweeping, do not reflect a disabling impairment. *See Craig v. Apfel,* 212 F.3d 433, 436 (8th Cir. 2000)(fact that claimant "continues to engage in many normal daily living activities including driving, shopping, visiting with friends and relatives, and picking up her grandchild" supports finding of ability to work); *Pena v. Chater,* 76 F.3d 906, 908 (8th Cir.1996) (grocery shopping, driving, and daily child care inconsistent with claims of disabling pain); *Walker v. Shalala,* 993 F.2d 630, 631–32 (8th Cir.1993) (daily activities of driving, cooking and washing dishes inconsistent with claims of disabling pain).

The Court holds that Brown's poor work history further undermines her credibility regarding her claim of disability. Between 1994 and 2008, Brown's earnings ranged from $0 to

15

$8,189.86, with an average annual income of less than $2,700. (Tr. 163). The ALJ properly concluded that Brown's history of low earnings and scattered and erratic work record indicated that she was motivated by pecuniary gain in pursuing her disability claim. *See Fredrickson v. Barnhart*, 359 F.3d 972, 976 (8th Cir. 2004)(the ALJ properly found Fredrickson's testimony not to be credible in part because of his "potential lack of motivation to return to work (the sporadic work record reflecting relatively low earnings and multiple years with no reported earnings)"); *Gaddis v. Chater*, 76 F.3d 893, 896 (8th Cir. 1996)("We agree with the ALJ that there is a 'strong element of secondary gain in this case'").

The Court also believes that Brown's mental issues seemed to be largely dependent upon her situation. Many of the treatment notes on Brown's position contained evidence of negative mental symptoms that coincided with periods of increased situational stressors such as child custody issues. (ECF No. 25 at 6 (citing Tr. 17, 397, 486-87, 529, 536, 604)). Situational depression is not determined to be disabling. *See Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010)("The medical record supports the conclusion that any depression experienced by Gates was situational in nature, related to marital issues, and improved with a regimen of medication and counseling."); *Dunahoo v. Apfel*, 241 F.3d 1033, 1040 (8th Cir. 2001) (denying disability benefits were depression was due to her denial of food stamps and workers compensation and was situational).

Further, the medical evidence does not support a finding of disability. As noted by the ALJ, Brown's treatment pattern was intermittent. Brown never experienced the sustained and intensive treatment that one would expect of someone with a disabling mental impairment. *See Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (citing *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)(A pattern of conservative medical treatment is a proper factor for an ALJ to consider

in evaluating a claimant's credibility.). Brown started receiving mental health treatment, including medication and limited individual therapy in 2004. (Tr. 17, 582). However, Brown did not maintain a steady course of treatment, seeking treating off and on in 2006 and then waiting until May 2010 to resume treatment. (Tr. 17, 486-94). Brown began receiving treatment every three months until May 2011. (Tr. 486-514). Almost a year later she started again receiving mental health treatment. (Tr. 529). Based upon this record, the ALJ properly determined that Brown's lengthy, unexplained gaps in treatment were not indicative of Brown having a disability. Further, the Court finds that Brown's condition improved with medication. (ECF No. 25 at 8 (citing Tr. 14, 516, 536, 539, 568-70)). Brown even testified that her medication "calm[s] her down a lot." Such evidence is inconsistent with Brown's claims of disabling mental limitations. *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004); *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir.1995) (quoting *Stout v. Shalala*, 988 F.2d 853, 855 (8th Cir.1993))("'If an impairment can be controlled by treatment or medication, it cannot be considered disabling.'").

Further, the Court finds it significant that at least one physician noted that she was malingering. (ECF No. 25 at 10 (citing Tr. 14, 17, 32, 300-01, 511)). The emergency room physician, Jason Wagner, M.D. noted that Brown's statements about her medical history varied and she gave different mental health reports to the resident, nurse, mental health specialist, and himself. (Tr. 300-01). The state agency reviewing physician, Kyle Devore, Ph.D. and the mental health specialist who provided expert testimony, David Biscardi, M.D., interpreted Dr. Wagner's observation as evidence of malingering. (Tr. 32, 511). The Court finds that the ALJ properly considered these observations when he evaluated Brown's credibility and determined that her impairments were not as severe as alleged. (Tr. 14, 17). The Court also finds it

17

significant that Brown cannot point to any physician who ordered her or otherwise advised that she was unable to maintain any substantial gainful activity. (ECF No. 25 at 11 (citing Tr. 17); *see Young*, 221 F.3d at 1069 (The Court finds it "significant that no physician who examined [Brown] submitted a medical conclusion that she is disabled and unable to perform any type of work."). Rather, the treatment notes of Brown's physicians indicated that Brown's mental status was unremarkable and she was getting better with treatment. (ECF No. 25 at 11 (citing Tr. 248, 250, 254-55, 258, 266, 268, 271, 274, 281-82, 287-88, 294, 287-88, 294,297-98, 300, 304, 306, 309-10, 318-19, 323, 332-34, 337, 345, 354, 357-61, 366, 373, 393, 407, 414, 419, 422, 429, 444, 448, 451, 454, 456, 458, 484, 486, 489-90, 512, 514, 516-17, 519-20, 523, 526, 532-33, 536, 539, 568-70, 631, 633)).

Finally, the Court finds that the ALJ properly weighed the medical evidence. *See Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005)("the ALJ may disbelieve subjective complaints if there are inconsistencies in the evidence as a whole")(internal quotations omitted). The Court concludes that the ALJ appropriately evaluated the opinion of nonexamining physician Dr. Biscardi and found that his opinion was compatible with other evidence in the record and afforded it greater weight. *See Shimkus v. Apfel*, 72 F. Supp. 2d 1056, 1059 (S.D. Iowa 1999)("the fact the ALJ may have given greater weight to the opinions of nonexamining consultants than to [the treating physician] is not reversible error provided the ALJ explained his reasons for doing so"); *Davis v. Schweiker,* 671 F.2d 1187, 1189 (8th Cir.1982). Dr. Biscardi summarized Brown's mental impairments and determined that Brown's mental impairments did not meet or equal a listed impairment. Dr. Biscardi found that Brown had slightly limited activities of daily living; moderately limited social functioning; and moderate limitations with respect to concentration, persistence, and pace. (Tr. 31). The ALJ included credible limitations

in the RFC assessment, and the ALJ's conclusions are supported by substantial evidence in the record. Brown argues that the ALJ erred by relying on the opinion of a non-examining physician in formulating his RFC finding, but the ALJ is permitted to consider opinions from medical experts on the nature and severity of a claimant's impairments, although they may be given less weight than examining sources. *See McCoy v. Astrue*, 648 F.3d 605, 615 (8th Cir. 2011); *Wildman v. Astrue,* 596 F.3d 959, 967 (8th Cir. 2010) ("[T]he opinions of nonexamining sources are generally ... given less weight than those of examining sources."); *Thiele v. Astrue*, 856 F. Supp. 2d 1034, 1047 (D. Minn. 2012) ("if the ALJ did not rely solely on the nonexamining physician's opinion but also conducted an independent review of the medical evidence and other evidence, such as motivation to return to work and daily activities, then there is substantial evidence in the record to support the ALJ's RFC determination"). Accordingly, the Court holds that the ALJ properly accounted for Dr. Biscardi's opinion by limiting Brown to simple, routine, repetitive, and unskilled tasks with no more than occasional interactions with supervisors, coworkers, and the public. (Tr. 19).

The Court also does not agree with Brown's argument that the ALJ did not properly consider the opinion of her supposed treating physician, Dr. Loon-Tzain Lo. First, the Court notes that Dr. Lo prepared only two treatment notes prior to completing a questionnaire prepared by Brown's attorney. (Tr. 631-34). Because Dr. Lo only saw Brown on two prior occasions, his opinion is not entitled to controlling weight as a medical opinion of a treating source. *See Randolph v. Barnhart*, 386 F.3d 835, 840 (8th Cir. 2004) (the physician's "March letter in which she opined that she did not believe Randolph was able to work is not entitled to controlling weight as a medical opinion of a treating source ... because [w]hen she filled out the checklist, [the physician] had only met with Randolph on three prior occasions."); *see also* Soc. Sec.

Ruling 96–5p (noting that such an opinion, even when given by a treating source, "can never be entitled to controlling weight or given special significance"). Second, the Court does not believe that Dr. Lo's notes supported a finding of disability. In response to Brown's attorney's questionnaire, Dr. Lo explained that she assigned Brown a GAF score of 50 based upon her persistent auditory hallucinations, which reduced in intensity with medication. (ECF No. 25 at 15 (citing Tr. 636)). Dr. Lo also noted that Brown had been unable to hold employment for some time and was unable to maintain stable housing. (Tr. 636). Dr. Lo, however, provided no objective medical evidence to support this conclusion and, therefore, it is not entitled to controlling weight. *See Samons v. Astrue*, 497 F.3d 813, 818 (8th Cir. 2007) ("But the ALJ may give a treating doctor's opinion limited weight if it provides conclusory statements only ... or is inconsistent with the record[.]"). In addition, Dr. Lo's diagnosis of auditory hallucinations is inconsistent with his treatment records where Brown denied auditory and visual hallucinations on both November 27, 2012 and December 11, 2012. (Tr. 631, 633). *See Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir. 2009) ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes.").

In addition, the Court holds that the ALJ properly considered Brown's GAF scores when considering the medical evidence. The GAF scores are only one piece of evidence for the Court to consider when determining a claimant's mental impairments. *Halverson v. Astrue*, 600 F.3d 922, 930-31 (8th Cir. 2010) ("the Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' ... the GAF scores may still be used to assist the ALJ in assessing the level of a claimant's functioning") (internal citation omitted); *Howard v. Comm'r of Soc. Sec.,* 276 F.3d 235, 241 (6th Cir.2002) ("While a GAF score may be of considerable help to the ALJ in formulating the [residual functional capacity], it is not essential

to the RFC's accuracy."). The Court finds that The ALJ considered the entire record, including her GAF scores, in determining that Brown's mental impairments were not disabling. While the ALJ did not discuss Brown's low GAF scores, the regulations do not require the ALJ to discuss every piece of evidence submitted. *See Black v. Apfel,* 143 F.3d 383, 386 (8th Cir.1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered...."); *Young*, 221 F.3d at 1068 (citing *Reynolds v. Chater,* 82 F.3d 254, 258 (8th Cir. 1996)("Although specific articulation of credibility findings is preferable, [the Court] consider[s] the lack thereof to constitute a deficiency in opinion-writing that does not require reversal because the ultimate finding is supported by substantial evidence in the record."). The ALJ thoroughly discussed Brown's medical records (Tr. 14-15), which included her GAF scores, which indicates that he was aware of and considered them in determining Brown's RFC and making a finding that she was not disabled.

In sum, the Court finds that the ALJ properly evaluated and considered the evidence, including Brown's medical records, the opinions of Dr. Biscardi, and Brown's daily activities to support a finding that Brown was not disabled based upon any mental impairment.

## VI.    Conclusion

Based on the foregoing, the Court finds that the ALJ's decision was based on substantial evidence in the record as a whole and should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that this action is **AFFIRMED**. A separate Judgment will accompany this Order.


Dated this 9th day of July, 2015.

_Ronnie L. White_

RONNIE L. WHITE
UNITED STATES DISTRICT JUDGE